Good morning, Your Honors. May his good name please the Court. I'm Robert Jobe and I'm appearing today on behalf of the petitioner Daljeet Singh Goraya. Although the immigration judge offered a number of reasons for his denial of Mr. Goraya's applications for relief, the Board of Immigration Appeals affirmed only two. The IJ's finding that Mr. Goraya's application for asylum was untimely and the immigration judge's adverse credibility determination. Now, the adverse credibility determination is set forth on pages 97 through 100 in the administrative record. Just a minute, Mr. Jobe. Are you challenging the first ruling? Yeah, I'm telling you this ruling. On that ruling, Your Honor, we'd like the opportunity to file letter briefs because obviously at the time that we filed our brief in this case, a Hacopian had not been decided and that case would control on the issue of the one year. In this case, even the immigration judge said himself that the – this is on page – Did you cite Hacopian? 155. I mean, we found Hacopian, but did you actually cite it? No, we haven't cited it. It wasn't out, obviously, until after the briefing in this case. You didn't cite a 28-J letter? No. We'd like to file a letter brief on that because, again, it's not something that we raised in our brief and it's not something that I think would be appropriate for a 28-J letter, but I do think – You don't think it is appropriate for a 28-J letter? I don't think it was because it's not something that we raised in our opening brief and I thought that we would be supplementing his arguments made in the opening brief. Well, you certainly mentioned the fact that you had essentially acceded to – that there was no dispute over this issue because it had been alleged. Right. Exactly. And we set that forth on a footnote in our brief and even the government conceded at the hearing in this case that there was no dispute over the date of entry. The immigration judge ultimately agreed. But, you know, under Hacopian, obviously, we have an issue of undisputed facts and under Hacopian, the application – But ultimately, if that were true, you'd still have the credibility issues with regard to the asylum and the throat holding issue. Right. Exactly. Let me ask you something about credibility. It looked to me as though there was no good explanation of why the papers were DHLed to New York instead of Seattle. Right. And it looked like he was given an opportunity to explain it and he just didn't explain it. And it looks as – if I read this correctly, it looks as though he says he came back to the farm to help his father in 2001 and his father got him out of the police station after the second arrest and arranged his travel. But he also said his father was in hiding and had not been home since 1999. Yeah. That seemed like just the sort of straight down the middle, heart of the case conflict in his own testimony that they could rely on. Why not? Well, let's take those one at a time. Okay. The first one, with respect to whether he could authenticate these documents, the immigration judge didn't use that to bolster his adverse credibility finding. If you look at the immigration judge's decision, and Judge Kammerich does this pretty much consistently, he sees these things as two separate aspects of the case. First he analyzed credibility and then he analyzed whether or not he, Mr. Goraya, had presented adequate evidence of his identity. And with respect to these documents, he simply said, I have no idea whether they're real or not. And he said that three separate times in his decision. I have no idea whether these documents are bona fide or not. So I'm not going to give them great weight. But he didn't use that to bolster the adverse credibility finding. He said explicitly. I'm not talking now about misspelling signature on the supposed driver's license. What I'm talking about is where they were sent. If his parents sent them, you'd expect them to send them to him in Seattle. I absolutely agree with that. And I think that's an issue. But the immigration judge, what's important here, is that the immigration judge used that only to give that document diminished weight. He didn't use that to bolster his adverse credibility finding. And if you look at pages 106. I understand what you're saying on that. Now, move me to the father, 1999. If I could just make one more point on that, Your Honor, before I move on to the father. 106 and 107, he says explicitly that this is an independent ground, separate and apart. That's the word he used. Independent ground, separate and distinct from the adverse credibility finding. Now, on the father, you said that he testified that he was in hiding. He never actually said that. I mean, I've gone through this record a couple times. I didn't write the brief in this case, but I've gone through the record and the briefs. He never used that term that he was in hiding. The government used that term. The immigration judge used that term, but he never used that term. And moreover, what he said is that if he was going back and forth. Right. Exactly. The testimony here, it's on page 163, 164. Where's your father now? He's living in different places, different places, sometimes on the phone. He does tell that, you know, he's here, but he doesn't live in one place. That's all he said is that he's not living in one place and that he's in telephone contact. Same thing on page 176. And if you look at it again, page 187, the government lawyer says, when did he stop living at home, when did he start living in hiding? That's where this hiding thing comes in. Well, wait a minute. I'm looking at 187. Your father, when did he stop living at home, when did he start hiding? Right. Answer. This was after he was arrested the first time, and then it says just what you just said. Then after that, he stayed for a very little time at home, and then he'd go somewhere, come back, go somewhere, and come back. Right. But then it continues. Okay, so from 1999 until today, how often is he coming home? Answer. He hasn't come for, I mean, he just calls. He hasn't come. Right. That's right. No one's disputing that he's not coming home. That's not the point. The issue is how much contact is he having with him. Now, the judge basically said, well, how could he have obtained your release, helped you arrange this work visa if you weren't in contact with him? But he never said he wasn't in contact with him. But he did say he was coming back. At one point he said he came back to help his father on the farm. I'm sure it suggests his father was on the farm. There's a suggestion of that, but it's not clear. It's not clear because obviously the father owns the property. He's probably managing the property from the farm. He does say his father came back when he was leaving. That's true. That's all true. But there's nothing inconsistent about the fact, his testimony, that his father wasn't living at home. But more importantly, these are issues that could have been raised at the hearing. And under our Ninth Circuit law, if you're going to use this against him to discount his credibility, the judge had an obligation to ask him about these supposed discrepancies. But the judge never did that. No, he wasn't. He was never asked. Counsel had brought it all out. You're saying that our law is that when counsel brings out something, asks all about it, the person has a full opportunity to explain, the judge nevertheless has to do the whole thing over? No, I'm not suggesting. What I'm suggesting is that insofar as the judge saw a discrepancy between these various aspects of his testimony, yes, he had an obligation to point that out and give it to the Ninth Circuit. Where does that obligation come from? But he didn't. Where does that obligation come from? From our case law, Your Honor. It starts with Compro Sanchez, but these cases are set forth in the opening brief that we filed. I had thought those cases just said fair opportunity to explain, not that the judge has to give him a do-over. No, I'm not. This is not a do-over. I mean, obviously. Here's what I'm concerned about. When I was a district judge making findings of fact, I'd often leave the bench unsure, and then I'd go through my notes of care and say, my gosh, this is a real problem. This is very significant. And it seems to me what you're saying is that if I had the same sort of duties as you think an I.J. does, I would have had to restart the trial, crank it back up again, bring the witnesses back or tell the lawyers to do that, and tell them, gee, I noticed something when I was going through my notes. Here's a problem. Could you please talk about it again? The case law is pretty clear, Your Honor, that the immigration judge has to develop the record. And part of his obligation in developing the record is to give the applicant for asylum an opportunity to explain any perceived discrepancies. Now, the applicant shouldn't be in the position of having to guess what the immigration judge believes to be discrepant. If the immigration judge sees something that he believes discrepant, that the attorney doesn't believe is, in fact, discrepant, doesn't really go into, the immigration judge has an obligation to ask him about it. The law on that, I think, is pretty clear in our circuit. And in this case, the judge didn't. He simply waited. He basically trapped him. He set up what he perceived to be discrepancies. Basically what you do when you catch people lying is you trap them. Well, yeah, you set it forth and then you go in for the kill. You lay the groundwork and then you go in for the kill. But here, no one ever went in for the kill. No one ever actually gave this guy any opportunity to explain what he perceived as a discrepancy. The problem here, Your Honor, is you may see it as a discrepancy and the immigration judge may see it as a discrepancy, but the applicant probably didn't and neither did his lawyer. Because the applicant and the lawyer, they understand the full story and they understand, perhaps, that the father's away. He's managing the farm by telephone. You know, the mother might be in communication with the father when he learns that the son's arrested. The mother might call him. She knows this in her mind. That's what she's thinking. The judge is saying something different. And insofar as the judge is saying something different, the judge has an opportunity or an obligation, actually, to raise it and give the applicant an opportunity to explain it. Let's go back for a moment to the documents. I have a hard time understanding why it's not relevant to somebody's credibility that they are providing documents that appear not to be genuine. I understand that the district court, the IJ, seemed to put it into two different sections of the opinion, but the fact that he was presenting documents that he didn't exactly know where they came from and that had some highly questionable stuff in it. I agree with you that if the immigration judge had said, I don't believe these documents are genuine, that would go to credibility. But he didn't. He said the opposite of that. He said they're not reliable. But if you look, that's his ultimate conclusion. But if you look through that analysis where he says over and over again, here on page 104, 105, the documents were given diminished weight and the court has no idea if they are authentic or not. Those are the two driver's licenses. Further down, he's talking about the school certificates, and this is on page 106. The court has no idea if this document is authentic. This is repeated. He says it three times with respect to each and every one of the documents. I don't know if they're genuine or not. If you're going to use a document to bolster an adverse credibility finding, you at least have to have a tentative conclusion that they're not bona fide. Thank you. Thank you very much, Mr. Jorge. That's my analysis of our review. We'll hear from the governor. The court, please. I'm Marshal Tamer Golding, representing Reese Esposito in this case. Do you agree under the Coppion case that the adverse credibility with regard to his arrival is incorrect? I'm sorry, ma'am. Do you agree that under the Coppion case that the adverse credibility determination with regard to the date of his arrival or the holding that he did not prove the timeliness of his asylum doesn't comply with our case law now? I have to confess that I'm not familiar with that case. It wasn't raised, of course, and nor was there a 28-J letter on it. It's interesting because we got a 28-J letter on the case from one of your colleagues in a different case. Well, the thing is it wasn't an issue in this case because he didn't – he waived the objection. Well, I'm not sure about that. But go ahead. Go on to the credibility issue. But I will also make one other comment here, too, that he had the burden – I mean, just in general, he had the burden of proving when he arrived. Yes, but what a Coppion says, and which makes perfect sense, is yes, except that here the government was alleging it and conceding it. So why did he have a burden? He met his burden. As we pointed out in our brief, the government didn't concede that. What the – it was fairly clear that the order to show cause was issued after he was picked up by the Border Patrol. He says to the Border Patrol agent, I came in at such and such a time. It's like in any moving papers. The moving papers say you arrived in X date. He certainly – that seems to me to be a fact that the government is itself alleging and therefore conceding, and that's what a Coppion holds in any event. Well, I would just say it's not in this case. All right. Go ahead. Well, you have to agree, I assume, that the notice of appear specifically said February 20, 2004. Well, that – I still – I suggest, Your Honor, that all this means is the Border Patrol agent picks up an alien. The alien says, I came in at such and such a time. That's what the Border Patrol fellow puts down. But that is not a concession that that's when he came in. But it's in your notice of appealing to appear. Well, it's a pleading. It's – if the complaint says that the accident was a year and a half ago and the statute of limitations is two years, it seems like the statute of limitations is out of the case. It seems like once the government pleads that he came in a year of his filing, then it's the government's burden to say, oh, we made a mistake, we relied on what he told us and when he was picked up and we didn't mean what we said. I have to confess at this point I've been talking off the cuff since I have not focused on the question. So if the court wishes, I will be willing to – Maybe you could go to the – Let's talk about the credibility issue. All right. And specifically, did the immigration judge give the petitioner a chance to respond to these inconsistencies? I don't know whether he specifically did by saying, well, that doesn't sound right to me, will you explain it, please? But starting point is that he has the burden of proving – of burden approving his case which starts with the burden approving that the underlying facts upon which he bases it are true. And therefore, it is his burden. He has to carry that burden of proof. And all that a adverse credibility determination is or needs to be is a determination that the individual has not carried his burden of proving that what he says occurred in fact yet occurred. The I.J. here kept saying that he was vague. And I've looked over the transcript and he was – he told his story, it was fairly complete and he was not cross-examined with regard to any of his details. So what does he mean by saying he was vague? He said what happened, for example, with his beating. He said where it occurred. He said how it occurred. He said what happened afterwards. And then the I.J. says – and the government lawyer doesn't ask him anything to which he doesn't respond. So how is that a basis for credibility – for saying he's not credible? Well, again, it's not saying he is not credible. It is not saying you're a liar. It is saying you haven't proved to me that what you're saying is true. All right. Fine. First of all, maybe it's the way our case law ought to read, but leaving that aside, why is it a basis for saying that you haven't proved to me that you are credible? If he tells a story, it's, you know, relatively detailed and there's no cross-examination, there's no question that he doesn't answer. Nobody said – putting aside the issue about where these documents came from, that he didn't answer. But in no other instance did someone say to him, tell me what happened, and he couldn't answer it. Well, let me make one quick observation here, that identity is part and parcel of credibility. If I say I am somebody and I'm not that somebody, I'm not credible. So therefore, even though this particular judge divided it, this was still part of a credibility determination. And again, by the way, the judge used the phrase, I have no idea. Now, I have no idea means I don't know whether to believe you or not. And this court, in two cases, Sidhu and – I cited them on my case. You haven't answered my question. Which is? I'm sorry, ma'am, I'm not sure I – My question is, what support is there for the conclusion that the stories he told specifically about what happened to him were unduly vague and therefore a basis for finding that he didn't establish credibility? Well, first off, let's start with the thing about his father. He very clearly says that his father left home, has not been back. I haven't had no contact with my father. He talks on the telephone with my mother, but not with me. He didn't say I've had no contact with my father. He said recently I've talked to him, but he didn't say over this whole period of time I had no contact with my father. That was an inference which was not in the record. Let me see if I can find this here. Tell us page number. Pardon me? That's what I'm answering for, because I wrote this down somewhere. All right. Is this paper not coming over here? He said his father wasn't home. No, he said that his father lived different places. Right. Okay. Let's hear what he said. 164, father lives in different places after his March 1998 arrest, because the police are still searching for him. 176, father talks to the mother on the phone, but not to him. That's now, presently. No, he says that right along. I don't have the record with me here, but as I didn't like the exact language, but he said that his father has talked on the phone to his mother, but not to him. You don't have the excerpts there? I thought you were reading to us from the excerpts of records. No, actually what I was reading here was his annotation. I didn't hear your response to my first question. What I'm reading from here is simply notes which I just typed out. See, I was looking on page 164 of the excerpts and trying to find what you were reading. Well, all I know is – I can't give you the exact lines, Your Honor. Maybe I should have done that. But he did say he lives in different places. All right. That's in line 1, page 164. Right. Okay. He lives in different places. That doesn't say you didn't have contact with him. What else? But on 1, page 76, it said, My father talks to my mother on the telephone. He does not talk to me. He didn't say, This is today what I'm in the United States. That was my understanding of what he said, actually. And since you don't have – actually, I don't have it either. I can't prove up the point, but that was what he said. Oh, I certainly read it. No, I don't have it in front of me, and I guess you can look on page 176. But, again, he says, His father has lived in different places. Has not – after that arrest, has not come back. Well, line 2, Have you managed to get to talk to him on the phone from time to time? Answer, No. He does not call me here, but he tells my mother. Is that the passage? Yeah, that's what I was referring to. All right. So that's not – so that is – it says what I said it says. Does here mean Seattle? Right. Okay. If you're going to make representations about what's in the record, it would be nice if you had the record. It really would. Put it this way. It can go one way or another. But if it can go one way or another – It can't go one way or another when it says here. I mean, you really need to have the record in front of you if you're going to make any representations about it. That's a pretty good record to carry with me from Washington, which is why I didn't – not carry it. Maybe I should have. But even so, he does – he clearly did say that his father has – lives in different places, has not been home. But he says in his written application that he – and this is at 575 – well, both 575 and also 166 – that he returns from his uncle because he wanted to get into helping his father on the farm. Now, again, a reasonable fact finder can look at that and say, he is saying that he came back to work with his father on the farm. Did this I.J. say that? Pardon me? Did he say that? The I.J. I am suggesting to the Court that the – possibly I should have started where I wanted to start, which is that the issue in this case is did his testimony and his evidence have such a compelling condition of truth that no reasonable fact finder could disagree with it? Mr. Golding, you again are not answering. You didn't answer my first question, and now you're not answering my second question. You never answered my question about why it was vague, and now you're not answering my question, which I just asked you, which is did the I.J. in fact rely? No. I am suggesting that the I.J. doesn't have to specifically pick it up. The burden of proof is not on the I.J. to find a reason to disbelieve. It is upon the alien. Do we review something that the I.J. didn't say? I am suggesting that when you put together two things, the burden of proof and the no reasonable fact finder, that what this means is that it is the alien's testimony that is to be reviewed. Thank you. Thank you very much, counsel. Your time has expired. The case just argued will be submitted for decision, and we will hear argument next in United States v. Struckman.
judges: O'scannlain, Kleinfeld, Berzon